IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR 09–25–H–CCL-01 |
| Plaintiff, | CV 12-13-H-CCL |
| vs. | ORDER |
| GLENN STEVEN SCOTT, | |
| Defendant. | |

Before the Court is Defendant Glenn Steven Scott's Motion to Vacate, Set Aside, or Correct Conviction and Sentence Pursuant to 28 U.S.C. § 2255.  In addition to his section 2255 motion, Defendant has also filed a motion to recuse the undersigned district judge, which of course must be decided before the Court rules upon the section 2255 motion.

In analyzing Defendant's recusal motion, the Court found it necessary to thoroughly review Defendant's section 2255 motion because there is significant overlap between the two motions. The procedural history of the underlying criminal case is lengthy. Defendant's section 2255 claims are numerous, and they relate to every phase of the case. Defendant's factual allegations in support of recusal are intertwined with and overlap the more numerous section 2255 factual allegations. In order to present the complete context of the case for the purpose of explaining the Court's reasoning as to both motions, the Court will (1) describe the case and its administration, (2) analyze Defendant's section 2255 claims, and (3) address Defendant's recusal allegations.

**Factual Background**

Defendant has raised numerous claims beginning almost from the first hearing to the last hearing. The Court therefore deems it advisable to set forth a detailed description of this case, as set forth in the record and the Court's own notes, before proceeding to consider Defendant's claims.

Defendant is an inmate with an unusual personal background. He is possessed of an Associate of Applied Science degree in paralegal studies (Okaloosa Walton Community College (Niceville, Florida), 1993[1]), and he has put his degree to use in his filings. From 1996 to 2009, Defendant worked on oil drilling rigs in 56 countries in various positions, but mainly as an electrician or electrical inspector. Defendant presented himself to the Court in his hearings as an intelligent, middle-aged professional. His numerous claims of error are fact-driven and detailed. At the time of Indictment, Defendant was 52 years old. Defendant states that he graduated from West Jefferson Senior High School in Gretna, Louisiana in 1974, but his Okaloosa transcript indicates that he was admitted to that institution by possessing a State of Florida GED. He also attended a Vo-Tech in Chipley, Florida, in 1978-1980, where he received training as an electrician. (*See* PSR ¶¶ 64-67, 69-73).

---

[1] Defendant reported receiving his Associates degree in 1983. The Presentence Report ("PSR") reports that Defendant received his degree on December 10, 1993. (PSR, ¶ 65.)

Defendant enlisted in the U.S. Marine Corps on April 29, 1974, and was honorably discharged on December 30, 1977. (PSR ¶ 74.) The National Personnel Records Center indicates that Defendant enlisted on April 30, 1974, and was honorably discharged on June 21, 1976. Defendant was a Field Radio Operator, and his DD214 (Defense Department Form 214, "Report of Separation") shows "foreign service," but provides no detailed information about that service. (PSR ¶ 75.) Defendant states he was in Vietnam for three months. (PSR ¶ 74.) Defendant reenlisted June 22, 1976, and was honorably discharged on December 30, 1977. (PSR ¶ 76.) During his second enlistment, his station was Marine Barracks, NAS, Cecil Field, Florida. (PSR ¶ 76.) Defendant also joined the Florida Army National Guard in 1978 and was honorably discharged in 1980. (PSR ¶ 77.)

Defendant was originally charged in 2009 in state court with the instant child pornography offense in the Montana Fifth Judicial District Court, in *State of Montana v. Glen S. Scott*, DC 09-06. (Doc. 12 at 2, ¶¶ 2-3.) The state criminal case was dismissed after this federal case was initiated. Later in 2009, Defendant

was charged in the District of Montana with Receipt of Child Pornography (Count I, 18 U.S.C. § 2252A(a)(2)), Possession of Child Pornography (Count II, 18 U.S.C. § 2252A(a)(5)(B)), and Destruction or Removal of Property to Prevent Seizure (Count III, 18 U.S.C. § 2232(a)).

Both the state and federal charges arose from the same events, which the evidence indicated began in about 2003 and ended on May 20, 2009. After a citizen complaint and investigation by the Jefferson County Sheriff's Office, a state district judge issued a search warrant for the Defendant's residence, RV travel trailer, and storage unit, all located on a 140-acre parcel of property, which property was searched on May 21, 2009. It was alleged in the Indictment that Defendant destroyed some of his computer equipment (smashing a hard drive with a hammer) to obstruct the investigation at some time prior to the search.

Defendant was charged by a federal grand jury in November, 2009. After arraignment, Defendant was set for jury trial and released on conditions. His defense counsel at the outset of this case was Michael Donahoe, who is a Senior Litigator at the Helena Office of the Federal Defenders of Montana. Mr. Donahoe, who is an experienced litigator who has tried many cases before this Court, filed a

Motion to Suppress evidence in February, 2010. (Doc. 27.) The evidentiary hearing was held on March 17, 2010. (Doc. 34.) Defendant presented two witnesses, Jefferson County Sheriff's Deputy Shaun Gardner and Detective Robert Gleich. Defense counsel challenged whether the state warrant application was supported by probable cause, whether the description of the child pornography was sufficient to justify issuance of the warrant, and whether the warrant applicant intentionally or recklessly failed to include all contextual information in support of the search warrant. The citizen complainant was a 50-year-old man who had been hired by the Defendant to help construct Defendant's residence; the complainant lived on Defendant's property with his 9-year-old daughter.

The complainant reported to law enforcement that he viewed images on Defendant's computer of 5 to 9 year-old girls, wearing makeup and completely nude; the images were of such a nature to cause the complainant to be "disturbed and offended," and also to cause the complainant to move himself and his 9-year-old daughter off of Defendant's property and to report to law enforcement that Defendant's computer had "child pornography" on it. (Doc. 28-1 at 4-7.)

This Court denied Defendant's suppression motion in an Order dated

March 29, 2010 (Doc. 38), ruling that the complainant's description of the images provided a fair probability that the evidence to be seized was contraband or related to commission of a crime. Defendant's view of the complainant was that complainant was merely a disgruntled former employee with an ax to grind, and Defendant asserted that those facts should have been included in the affidavit in support of probable cause. (However, Detective Gleich testified that he (unlike Deputy Gardner) actually was not aware of all of the factual context of the underlying employment dispute when he submitted his affidavit in support of the search warrant.) Defendant asserted that the complainant lacked credibility and the search warrant should not have been issued by the state district judge. This Court disagreed with that assessment because the complainant was perfectly forthright in his report to law enforcement about his employment dispute with the Defendant, including the unpaid wage dispute and the dispute over the complainant's taking Defendant's shotgun in lieu of wages (which shotgun was upon request promptly turned over to the Jefferson County Sheriff's Office). The complainant brought the gun to law enforcement, told them what he had done, and why he had done it. If anything, had all these facts been presented to the state

district judge, the complainant's credibility would have been *bolstered* by the complete factual context, and those facts would not have detracted from the ultimate probable cause determination.

Shortly after the Court's denial of Defendant's suppression motion, but prior to March 31, 2010, Defendant fired his appointed counsel, Mr. Donahoe, in order to retain two new defense counsel. Defendant also sought a continuance of the trial date to permit his new attorneys to prepare for trial. The Court granted the continuance motion and allowed Mr. Donahoe to withdraw as counsel so that Defendant could be represented by retained counsel, Jack Morris and Stephen Andersen. On April 9, 2010, and in view of Defendant's anticipated sale of land and residence, this Court ordered Defendant to repay the government for the services of the Federal Defenders of Montana. (Doc. 47.) After holding a hearing with new counsel regarding their request for trial continuance, the Court granted the continuance on April 18, 2010. (Doc. 49.)

At some point in late May, Defendant sold his 140-acre parcel, residence, and any outbuildings. This real property was valued at $350,000 and, according to

the PSR, it sold for $197,000.  (PSR ¶ 81.)  According to the Court's Financial Services Unit, Defendant had a check mailed to the Clerk of Court in the amount of $7,750, which check was received by the Court on June 2, 2010.[2]

On June 11, 2010, the U.S. Probation Office notified the Court that Defendant had recently removed his electronic monitoring device and could not be found.  (Doc. 50.)

On July 29, 2010, defense counsel Morris and Andersen moved to withdraw as Defendant's counsel on the grounds that Defendant had failed to pay their agreed-upon fee and that Defendant had been out of contact with them for over two months.  (Doc. 52.)  In November, 2010, Defendant was arrested by the U.S. Marshals Service in Tupelo, Mississippi.  Defendant was at that time living in a campground, working, and using a stolen identity.  (Doc. 84 at 2.)  The Court granted the motion to withdraw filed by retained defense counsel and appointed

---

[2]    Defendant previously had paid $50 on April 16, 2010, and $50 on May 10, 2010.  The June 2, 2010, payment was received in the form of a check from Rocky Mountain Title Co.

Mr. Steven C. Haddon as CJA counsel to represent the Defendant. (Doc. 54.)

Defendant was returned to the District of Montana, made his initial appearance

before a Magistrate Judge on December 2, 2010, and this Court set the matter for

jury trial on January 4, 2011.

According to his report to the Court on December 14, 2011, Mr. Haddon

spent two days reviewing the images from Defendant's computer equipment and

disks and discussing the case with previous defense counsel; Mr. Haddon

reviewed the file of prior counsel and obtained a copy of Mr. Donahoe's file for

review. (Doc. 58 at 5.) Mr. Haddon met with the government's computer expert

(Montana Department of Justice, Agent Jimmy Weg) to understand the

methodology used by Agent Weg[3] in analyzing the computer evidence. (Doc. 58

---

[3] Agent Jimmy Weg is an expert employed by the State of Montana who for over a decade has testified on numerous occasions in child pornography cases in the District of Montana. The PSR indicates that Agent Weg found 40 images of child pornography on Defendant's laptop computer, 408 images on a portable hard drive and thumb drives, and numerous additional images of child pornography on disks. These images included images of children under the age of 12 engaged in sexual conduct with adults. Many of the images were watermarked by known purveyors of child pornography. (*See* PSR ¶¶ 23-24.)

at 5.)  Mr. Haddon informed the Court that he had not yet determined whether it would be necessary to obtain the services of a computer expert to independently review the methodology utilized by the government's expert.  (Doc. 58 at 6.)  Mr. Haddon requested additional time to prepare for trial and to allow him to advise Defendant fully regarding the possibility of a plea agreement.  That request was granted by Order dated December 16, 2010, and jury trial was set down on March 7, 2011. (Doc. 59.)  On March 3, 2011, however, Mr. Haddon informed the Court that he had contracted a severe respiratory infection and was under physician-ordered bed rest for one week.  (Doc. 67.)  This Court granted a trial continuance to permit defense counsel to represent Defendant at trial, and the trial was reset for April 26, 2011.  (Doc. 68-69.)  Finally, the jury trial (originally scheduled to take place on March 1, 2010, commenced on April 26, 2011.

After picking a jury on the morning of April 26, 2011, the undersigned released the jury at 12:10 p.m. with instructions for the jurors to return promptly at 1:10 p.m. for opening statements.  My law clerk's notes state that at 1:10 she entered the courtroom and the deputy clerk informed her that the parties were

engaging in plea negotiations (outside of the courtroom). My law clerk's notes, quoted in pertinent part below, state that a delay followed and the trial resumed outside of the presence of the jury:

> 1:10 we have plea agreement in progress according to deputy clerk of court.
> Delay
> 2:05 p.m.
> CCL: "Record will show we are in open court outside presence of jury.
> The jury in the jury room on recess.
> I have been advised that the defendant wishes to be heard from outside the presence of the jury.
> So I will call on defense counsel and the defendant.
> United States is also here by counsel.
> Mr. Haddon you may proceed."
> Mr. Haddon: "Mr. Scott and I met after lunch. He expressed interest in entering a plea agreement with government."

After the parties informed the Court in open court, on the record, as to the essential elements of their plea agreement, *see* Doc. 95, COP TR 3:20-4:12, the Court agreed to hear Defendant's motion to tender a guilty plea, COP TR 5:3-12, and that hearing began immediately.

As is the Court's custom, the Court had the Deputy Clerk administer an oath to the Defendant "solemnly swear[ing] that all of the answers [given] in response to the question put to [him] by the Court [would] be the truth...." (COP TR 5:13-

17.) The Court warned the Defendant that false answers to any of the Court's questions could be held against him in a later proceeding. (COP TR 5:20-24.) The Defendant stated that he was satisfied with his counsel's services. (COP TR 9:14-23.)

The salient points of the Defendant's plea bargain with the government were these:

> **MR. HADDON:** Mr. Scott will plead guilty to Count II, which is the possession of child pornography, and Count III, which is, as I characterize it, the destruction [of evidence] count. As part of the plea agreement Mr. Scott has agreed to waive his appeal of the Court's substantive ruling of the suppression motion. We do leave open the avenue to appeal the sentence imposed by the Court. (COP TR 3:20-4:5.)
> **MS. HURD:** Just adding that he's also going to admit the forfeiture count. (COP TR 4:8-10.)
> **MR. HADDON:** Forfeiture count, yes, Your Honor. (COP TR 4:11-12.)
> **THE COURT:** You are not tendering a plea to Count I, which is the receiving count.
> **MR. SCOTT:** That's correct. (COP TR 10:14-16.)
>
> **MS. HURD:** Your Honor, the standard condition would be that the government would bring no further actions against Mr. Scott for any of the actions known to this date, free to make whatever sentencing recommendation we wish, all parties understand that the defendant will not get substantive responsibility points and will get obstruction

of justice points because of his fleeing, that there are no reservations
of rights to appeal, that he will still be able to appeal his sentence.
**THE COURT:**  Does that include a 2255 waiver?
**MS. HURD:**  Yes, Your Honor.  Any kind of a plea such as they would
have to agree to waive any 2255 rights with regard to the case.  (COP TR
11:5-20.)

After hearing from the parties as to the elements of their plea agreement, the

undersigned confirmed with the parties that the Court had not participated in any

fashion in their plea negotiations:

> **THE COURT:**  I think it's essential and it is the law that the Court
> cannot in any way enter into plea negotiations and I would at this
> point not consider this request further if there were any doubt in the
> minds of the defendant or either attorney that the Court in any way
> had participated in these negotiations.
> **MS. HURD:**  Your Honor, absolutely not.  The Court has not been a
> participant in these negotiations at all.  This is an offer that was put
> forth first by the government some period of time ago and then Mr.
> Scott today entered into that and, actually, the three of us sat down
> together and discussed this matter and the Court was not a party to
> that at all, as is proper.
> **THE COURT:**  All right.  Do you agree with that, Mr. Haddon?
> **MR. HADDON:**  I concur, Your Honor.
> **THE COURT:**  And Mr. Scott, that's your certification also, is that correct?
> **MR. SCOTT:**  That is correct, Your Honor.

(COP TR 14:10-15:6.)  With that assurance from the Defendant and counsel, the

14

Court proceeded to engage in its usual plea colloquy. The Defendant stated his offense in his own words: "I did download child pornography from the Internet and I had heard someone was going through my computer so I destroyed it, Your Honor." (COP TR 18:19-22.) The Defendant specifically acknowledged that he had destroyed one of his computers for the purpose of evading prosecution:

> **THE COURT:** And you destroyed it for the purpose –
> **MR. SCOTT:** Yes, Your Honor.
> **THE COURT:** -- of preventing the government from prosecuting you for violation of the law; is that right?
> **MR. SCOTT:** That's right, Your Honor. I'm sorry. (COP TR 18:23-19:5.)

The Defendant acknowledged that his computer contained hundreds of images of child pornography:

> **THE COURT:** But there were at least a large number of images that unquestionably are child pornography; is that right?
> **MR. SCOTT:** Yes, Your Honor.
> **THE COURT:** And does that number run into the hundreds?
> **MR. SCOTT:** Yes, Your Honor.
> **THE COURT:** All right. And it meets the description in each instance of a prohibited child pornography image.
> **MR. SCOTT:** Yes, Your Honor.
> **THE COURT:** And insofar as the images, those are unquestionably children in those images and that means a male or female child under the age of 18 years; is that correct?

15

**MR. SCOTT:** Yes, Your Honor.

(COP TR. 19:17-20:7.) The correctness of these statements was later verified by the U.S. Probation Office. In preparation for sentencing, a U.S. Probation Officer examined two large binders containing the images in question, and he determined "there were over 600 images of child pornography, prepubescent minor [sic] under the age of 12, and images depicting oral sex and sexual intercourse with minors." (PSR ¶ 12.)

At the change of plea hearing, the Court recited for Defendant the elements of both of the offenses that the government would have to prove beyond reasonable doubt in order to convict him and also the elements to be proven as to forfeiture. (COP TR 20:19-24:4.) The Court repeatedly questioned the Defendant whether he understood the requirements for a conviction, and the Defendant repeatedly affirmed that he did understand. The Court informed Defendant as to the penalties pertaining to the offenses. (COP TR 24:5-25:3.)

The Court sought clarity as to whether the plea agreement addressed the fact that Defendant absconded the jurisdiction prior to trial. The government informed

the Court as follows, and the Court responded for further clarification:

> **MS. HURD:** Your Honor. I think we all understand by his absconding he loses acceptance of responsibility points, which would be three points, and he gained two points for obstruction of justice.
> **THE COURT:** But the abscension is included within the agreement of the United States that there will be no further prosecution of the defendant.
> **MS. HURD:** Right.
> **THE COURT:** He's not charged with that in this particular indictment.[4]
> **MS. HURD:** That's correct.
> **THE COURT:** It really isn't part of the charge. There is nothing here that would prevent the government from proceeding to file that except for the agreement then and I want to make certain that everybody understands that there is no future right to charge the defendant with that crime.
> **MS. HURD:** Right, Your Honor.

(COP TR 25:12-26:7.) The Court raised this issue to clarify the plea agreement

---

[4] It is a federal offense to travel in interstate commerce to avoid prosecution. This offense is to be prosecuted only in the federal judicial district where the original crime was alleged to be committed. Flight to avoid prosecution is punishable by a term of imprisonment of five (5) years. *See* 18 U.S.C. § 1073. The penalty for failure to appear for jury trial as to Count I (receipt of child pornography) could potentially have been a sentence of up to ten years of imprisonment served *consecutively* to the underlying sentences. *See* 18 U.S.C. § 3146(b)(2).

for the record and to protect the Defendant's expectation that he would not be prosecuted for his flight from prosecution or failure to appear for jury trial.

At the time of Defendant's sentencing hearing in September 2011, Defendant claimed he had not looked at his presentence report, but Mr. Haddon stated that he had met personally with the Defendant and reviewed the presentence report with him. (Doc. 87, SENT TR 6:1-18; 7:2-7.) The Court recessed to allow Mr. Haddon to review the final Presentence Report with the Defendant. After Court resumed, Defendant expressed dissatisfaction with Mr. Haddon's preparation. Defendant wanted to have his VA psychiatrist testify at his sentencing hearing, and he also wanted his psychosexual evaluation to be submitted to the Court for sentencing purposes. Defendant asserted that Mr. Haddon was not competent legal counsel. (Doc. 87, SENT TR 16:4-10.) Because Mr. Haddon informed the Court that he was soon to begin work as a public defender for the State of Montana, the Court decided to appoint new counsel to represent Defendant through sentencing.

The Court inquired of the Defendant whether it would not be in his interest

for the Court to appoint Mr. Donahoe (Defendant's first attorney), since he was already quite familiar with the case. Defendant stated that "[t]here was a very heated altercation between Mr. Donahoe, myself, and the paid attorney at the time that Mr. Donahoe's employment was terminated." (Doc. 87, SENT TR 18:14-17.) In addition, the Court was aware that Defendant's former retained counsel (Mssrs. Morris and Anderson) informed the Court that they had withdrawn due to Defendant's failure to pay them as agreed. Therefore, the Defendant having previously terminated his relationship with his three prior defense counsel on less than satisfactory terms, this Court very reluctantly allowed Defendant's fourth defense counsel, Mr. Haddon, to withdraw.

The Court appointed new counsel, Mr. Jason Holden, another excellent defense counsel with whom the Court is quite familiar. (Doc. 86.) The Court granted a 45-day continuance to allow Mr. Holden to prepare for sentencing hearing. (Doc. 86, Doc. 88.)

At the time of Defendant's second and final sentencing, the Court followed the recommendation of the U.S. Probation Office and sentenced the Defendant to a

term of imprisonment of 135 months, consisting of 120 months as to Count II (possession of child pornography) and 15 months as to Count III (destruction of evidence). Defendant's Sentencing Guideline range was 135-168 months. The Court recommended that Defendant be designated for custody at Federal Medical Center, Rochester, Minnesota, so that he might be examined and treated for his cardio-arterial disease. The Court stated that it was sentencing Defendant at the bottom of his guideline range due to the fact that Defendant had a serious medical condition (heart disease) and post-traumatic stress disorder resulting from his military service in the United States Marines.[5] Defendant claimed to have served

---

[5] The Defendant claimed that in 2008-09 he had been diagnosed with PTSD at the Veterans Hospital, Fort Harrison, Montana, but, in fact, that diagnosis seemed to have been prompted by the child pornography investigation. The PSR indicates that Defendant was diagnosed with PTSD (chronic, moderate) by a VA psychologist approximately seven months after a search warrant was executed on Defendant's residence. (PSR ¶ 58.) Not one, but two defense counsel (both of whom investigated Defendant's claim of PTSD) deemed it to be improvident to request a downward departure based upon Defendant's PTSD. In reviewing this matter, the Court presumes that this was a tactical decision based upon weak evidence. Defendant did benefit from the Court's consideration of this mitigating circumstance, however, because the Court decided to sentence Defendant at the bottom of his guideline range instead of the top of his range (as was requested by

in Vietnam and also claimed to have served in combat, or at least in a combat zone.[6] The undersigned took Defendant at his word and gave him credit for having served honorably in the military in Vietnam under combat circumstances. The Court also credited that combat service in 1975 as being the basis for his diagnosis of PTSD in 2009. After imposing sentence, the Court notified the Defendant that he had the right to appeal his sentence and that he was required to file a notice of appeal within 14 days after entry of the Court's written judgment. The Court warned the Defendant that if he failed to file a notice of appeal he would lose his right to an appeal. The Court dismissed Count I pursuant to the plea agreement between Defendant and the government.

the government) out of consideration for Defendant's military service and subsequent PTSD.

[6] The Defendant claimed that he served in Vietnam for three months in 1975 and that he was involved in the Mayaguez Incident in May 1975. However, although Defendant's DD214 did show foreign service, the Probation Office could not verify Defendant's claims regarding his combat experience. Nevertheless, the Court did give consideration to this circumstance by sentencing Defendant at the bottom of Defendant's guideline range (not the top as was requested by the government).

**Section 2255 Standard**

A prisoner is entitled to relief under 28 U.S.C. § 2255 "[i]f the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack. . . ." 28 U.S.C. § 2255. However, it is the prisoner's burden to establish his claims, and the prisoner must "clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Where the prisoner has failed to raise his claims on direct appeal, as has Mr. Scott, he must also demonstrate that (1) good cause exists for his failure to raise his arguments and he would suffer prejudice if unable to proceed to such an extent as would undermine confidence in the outcome of the proceedings, or (2) he is actually innocent. *Id.* Defendant Scott makes no claim that he is actually innocent. Normally a procedural default is addressed first, but when resolution on

the merits is easily accomplished, it is permitted. *Lambrix v. Singletary*, 520 U.S. 518, 117 S.Ct. 1517, 1523, 137 L.Ed.2d 771 (1997).

This motion is subject to preliminary review to determine whether "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also* Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts. When this standard is met, a hearing is not necessary. *Marrow v. United States*, 772 F.2d 525, 526 (9th Cir. 1985). Moreover, section 2255 relief provides an extraordinary remedy, *see United States v. Addonizio*, 442 U.S. 178, 184, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979), and it is the petitioner's duty to prove entitlement to it by a preponderance of the evidence, *see Farrow v. United States*, 580 F.2d 1339, 1355 (9th Cir. 1978).

**DISCUSSION**

Defendant asserts ten grounds for relief. The first five grounds relate to the Court's denial of the Defendant's motion to suppress evidence and assert

ineffective assistance of counsel against Defendant's first defense counsel, Mr.

Michael Donahoe. The next four grounds relate to Defendant's jury trial, plea

hearing, and first sentencing hearing, and these next four grounds assert

ineffective assistance of counsel against defense counsel, Mr. Steven Haddon.

The last ground for relief asserts that the third defense counsel, Mr. Jason Holden,

offered ineffective assistance at Defendant's second sentencing hearing.

The Court begins by considering whether the Defendant entered a knowing

and voluntary guilty plea. The plea agreement provided that Defendant waived his

right to challenge his conviction or sentence by means of a section 2255 motion,

However, waiver of the right to file a section 2255 motion does not extend to

ineffective assistance of counsel claims wherein the complaint is that the guilty

plea was not knowing or voluntary or the claim is that the waiver itself was not

voluntary. *See United States v. Jeronimo*, 398 F.3d 1149, 1156 n.4 (9th Cir.

2005), *overruled on other grounds by United States v. Jacobo Castillo*, 496 F.3d

947, 957 (9th Cir. 2007) (en banc). The Court therefore proceeds to consider

whether Defendant entered a knowing and voluntary guilty plea and voluntarily

waived his right to file the instant section 2255 motion.

During Defendant's plea hearing, he was sworn to tell the truth, and the Court is confident that Defendant did understand that he ought to answer all questions truthfully. Defendant appeared to be an intelligent, educated, and sophisticated middle-aged professional. Defendant stated that the government had not used force, threats, or intimidation to secure his guilty plea. Defendant understood that he was going to plead guilty to two counts and that his guilty pleas would result in felony convictions. Defendant understood that he would lose certain civil rights, including the right to own or possess a firearm. The Court informed Defendant as to the maximum penalties for the two counts of conviction, and Defendant acknowledged that he understood those penalties. Defendant understood that he would have the right to appeal his sentence only (but--specifically--he would have no right to appeal any of the prior decisions of the Court). The Court informed the Defendant that he would not have the right to file a motion pursuant to 28 U.S.C. § 2255.

After the Court summarized Defendant's appeal waivers, Defendant

acknowledged that he was waiving his right to appeal *anything* other than his

sentence:

> **THE COURT:** . . . I gather that the agreement that you've entered
> into here today would prevent any appeal by you other than an appeal
> as to sentence imposed by the Court; is that correct in your mind?
> **MR. SCOTT:** Yes, sir.
> **THE COURT:** And Mr. Haddon, you agree with that?
> **MR. HADDON:** Yes, sir, Your Honor, we do.
> **THE COURT:** And Miss Hurd, do you also agree with that?
> **MS. HURD:** I do, Your Honor.

Defendant stated that he was fully satisfied with Mr. Haddon's services. (COP TR

9:14-24.)

The Court reviewed the elements of each offense, and Defendant

acknowledged that he understood what the government would have to prove

against him beyond a reasonable doubt. (COP TR 20:8-24:4.) Defendant

acknowledged that he knowingly possessed child pornography: "I did download

child pornography from the Internet and I had heard someone was going through

my computer so I destroyed it, Your Honor." (COP TR 18:19-22.) Defendant

acknowledged that "there were at least a large number of images that

unquestionably [were] child pornography...." (COP TR 19:17-20.) The Court

asked the Defendant whether the number of child pornography images numbered

in the hundreds, and the Defendant replied, "Yes, Your Honor." (COP TR 19:17-

23.) Defendant acknowledged that the ages of the children in the images were

under the age of 18 years. (COP TR 20:3-7.) The Court asked Defendant in

painstaking detail if he did what the government claimed, element by element.

(COP TR 20:14-23:10.) Defendant acknowledged that he did do the things the

government alleged. The Court inquired of the government exactly how many

images were of unquestioned child pornography, and the prosecutor stated that

"[m]ore than the statutory or more than the guideline requirement of 600, which is

the top level. There are somewhat over a thousand images, I think a few of those

could be questionable in terms of whether they're child erotica or whether they are

child pornography, but there are quite a number." (COP TR 32:16-25.) The Court

then specifically asked the Defendant whether he agreed with the summary of the

prosecution's case, and he responded "Yes, Your Honor." (COP 33:15-18.)

    In light of the foregoing, this Court found that Defendant was fully

competent, capable of entering an informed plea, that he understood the nature of the charges, and the penalties in connection with those charges. The Court concluded that Defendant's tendered guilty plea was free and voluntary and supported by a factual basis as to each essential element of the crime. (COP TR 36:22-37-21.)

If the Court may rely on Defendant's sworn statements in open court, it appears that Defendant entered a knowing and voluntary guilty plea and that he waived his right to challenge his conviction by means of the instant section 2255 motion. "Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." *Blackledge v. Allison*, 431 U.S. 63, 74, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977). *See also United States v. Ross*, 511 F.3d 1233, 1236 (9th Cir. 2008) ("Statements made by a defendant during a guilty plea hearing carry a strong presumption of veracity in subsequent proceedings attacking the plea.").

Nevertheless, Defendant's waiver does not extend to ineffective assistance

claims. After careful consideration, however, the Court concludes that Defendant's complaints regarding the ineffective assistance of counsel at the time of plea bargaining are without merit and some are frivolous. Defendant complains that his counsel did not have with him a copy of the "F.R.C.P." when plea negotiations took place outside the courtroom. (Doc. 100 at 31.) It may well be that defense counsel did not bring to the courthouse on that day all of the books and papers he might have utilized in a plea bargaining session with the prosecutor, but of course defense counsel did not know that Defendant was going to ask to plead guilty, after voir dire, during his jury trial.

Likewise, the fact that the prosecutor had a criminal code book and a sentencing guideline book is properly viewed as fortuitous, not problematic, because the prosecutor was able to ensure that the Defendant was properly advised as to the consequences of any guilty plea before Defendant decided to enter into a plea bargain. It was not ineffective assistance for defense counsel to permit the prosecutor to *correctly* advise the Defendant as to the penalties and potential guideline range his guilty pleas would entail.

Defendant claims that the Court participated in his plea bargaining with the government. The Court's notes indicate otherwise. The Court did explain to the Defendant--in open court, on the record--that it did not generally accept any pleas during the course of a jury trial except to all the charges in the Indictment. (COP TR 4:25-5:12, 12:9-14:9.) The Court made an exception for the Defendant in this case, who bargained with the government for dismissal of Count I, which carried a mandatory minimum sentence of five years. It appeared to the Court that the bargain was especially favorable to the Defendant in light of the fact that it required the prosecution to give up its right to prosecute Defendant for absconding while on pre-trial release. Such a future prosecution could have resulted in an additional *consecutive* sentence. Therefore it was assuredly in Defendant's best interest to obtain such a benefit by means of a plea bargain.

The Court is not persuaded that had defense counsel done anything more or differently, Defendant would not have pleaded guilty. Defendant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474

U.S. 52, 56-57 (1985). In considering all the facts, there is a "strong presumption that counsel's conduct falls within a wide range of acceptable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Defense counsel is to be given wide latitude in strategy and tactics.

The Court is not persuaded by Defendant's ineffective assistance claim as it relates to his guilty plea for the following reasons. First of all, Defendant did not manage to destroy all of the evidence against him. The remaining physical evidence contained over 600 images of child pornography. In the face of this overwhelming evidence, Defendant does not assert that he is actually innocent. Neither does Defendant explain what defense his counsel could and should have mounted. Even after reading Defendant's 44 page brief, this Court is still in the dark as to what defense could have resulted in a jury verdict of not guilty. Defendant is mostly stuck on the thought that there never should have been a search warrant issued and law enforcement should never have seized his computer equipment. In addition, Defendant asserts merely that his counsel should have

hired a computer expert and should have presented three witnesses (who apparently lived out of state and could not be found for trial).

In the face of the overwhelming evidence against him, Defendant does not explain what difference a computer expert could have made. Defendant fails to explain what the three witnesses (unidentified by Defendant and unknown to this Court) would have presented in testimony for the defense. The obvious conclusion--which clearly was the conclusion of defense counsel--is that, while a defense could have been presented, Defendant had no *winning* defense to the charges.

Given the fact that Defendant was in an extremely weak position and had made his situation even worse by absconding from the District of Montana, it was actually quite a coup that he negotiated away any future charges relating to his absconsion and the identity theft. Because Defendant had *both* destruction of evidence *and also* flight from prosecution as two significant obstructive factors during the investigation and prosecution of his case, Defendant was actually vulnerable to an upward departure under the U.S. Sentencing Guidelines. *See*

U.S.S.G §2J1.6, comment. (n.4).  Under all these circumstances, it is hard to see how there could be any probability, much less a reasonable probability, that but for defense counsel's errors Defendant would not have pleaded guilty.  Defendant was offered a benefit that he desired, and wisely he took it.

As to Defendant's bald claims that this Court told the prosecutor what she could or could not offer Defendant in plea bargaining, those claims do not match the Court's notes or the record in open court, and the Court finds further that Defendant's claims are "so palpably incredible or patently frivolous as to warrant summary dismissal."  *United States v. McMullen*, 98 F.3d 1155, 1159 (9th Cir. 1996), *cert. denied*, 520 U.S. 1269, 117 S.Ct. 2444, 138 L.Ed.2d 203 (1997).   Not only was defense counsel's performance not deficient, but also Defendant's guilty plea minimized the risk of a greater sentence and enhanced the possibility of the lesser sentence that he ultimately received.

It was Defendant's idea to enter a guilty plea.  The government negotiated a plea bargain with the Defendant and his defense counsel.  Defendant certified under oath that the Court was not a party to his negotiation with the government.

(COP TR 15:4-6.)  It is unsurprising that the plea bargain offered by the government during trial was *slightly* less favorable to the Defendant than the plea bargain it had offered to the Defendant one year and three defense counsel prior-- before Defendant fled the District of Montana for five months and was found in Mississippi only after a vigorous search by the U.S. Marshals.  Indeed, it is quite remarkable that Defendant thought that the government's year-old offer would still be on the table after voir dire.  It seems fairly obvious that the government simply was unwilling to give Defendant precisely the same bargain that had seemed appropriate to it some twelve months before.  Defendant's accusation that the undersigned punished him by requiring the government to offer him a less favorable plea bargain is unsupported by any common sense reading of the record in this case, and in fact these accusations are contradicted by the record.

Given a knowing and voluntary guilty plea, all or nearly all of Defendant's claims must fall.  Defendant waived any appeal of or collateral attack upon this Court's suppression order.  Defendant's claims of ineffective assistance of counsel relating to defense counsel's investigation and defense of the case prior to the

guilty plea are similarly waived. An unconditional guilty plea effectively releases all prior claims of constitutional defect. *United States v. Lopez-Armenta*, 400 F.3d 1173, 1175 (9th Cir. 2005), *cert. denied*, 546 U.S. 891, 126 S.Ct. 199, 163 L.Ed.2d 204 (2005). This matter has been long-settled by the Supreme Court:

> When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea....

*Tollett v. Henderson*, 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973).

This leaves for last Defendant's 10th ground, which is his claim that he received ineffective assistance of counsel at his final sentence by his fifth defense counsel, Mr. Holden.

Ineffective Assistance of Counsel - Second Sentencing Hearing

Defendant claims that his counsel, Mr. Holden, "did not fully investigate defendant's mitigating circumstances and failed to contact defendant's Veterans Admin. P.T.S.D. doctors nor obtain defendant's VA medical records." (Doc. 99 at

8.) Interestingly, the Court recalls that Defendant made the same complaint against his second attorney, Mr. Haddon, at the conclusion of that incomplete sentencing hearing. At that time, Defendant wanted to submit his psychosexual evaluation to the Court and have that doctor testify at his sentencing hearing, particularly as to his opinion that some of the thousand photos were not images of child pornography but child erotica. (Doc. 87, First Sent. Hearing, 11:19-12:10.) Mr. Haddon responded to Defendant's claim that these things should have been done by stating that

> the bottom line, Your Honor, is that my judgment is that if we would have brought the doctor in here who conducted this to testify, and had produced the report as we would have been obligated to do to the United States, that it would not have bode well for Mr. Scott. My view is it would have made this situation, potentially, much worse than where Mr. Scott finds himself today. That was a judgment call on my part, Your Honor. I stand by that judgment.

(Doc. 87, First Sent. Hearing, 12:16-23.) Mr. Haddon also stated that he spent two hours with the government's case agent looking at the images, and he had no doubt that the number of images had been properly counted. (Doc. 87, 12:24-13:5.) Indeed, Mr. Haddon concluded that "I was not willing to roll the dice, if

you will, to potentially make the situation for Mr. Scott much worse." (Doc. 87, 13:9-12. Mr. Haddon saw to it that the Presentence Report informed the Court of Defendant's physical and mental conditions, and Mr. Haddon requested that Defendant be placed in a medical facility in Rochester, Minnesota, in consideration of those physical and mental conditions. Mr. Haddon stated that, "And in my judgment, Your Honor, that covered the bases here." (Doc. 87, 15:21-25.)

However, Defendant continued to argue that he wanted this testimony and evidence in order to "elaborate" on the facts presented in the Presentence Report and to be helpful in obtaining treatment. (Doc. 87, 14:14-21.) Before deciding to appoint new counsel, this Court tried to warn the Defendant that presenting to the Court testimony of from his psychosexual evaluator (and the written report pertaining thereto) and his VA psychologist might indeed put him in a less favorable sentencing position (as was being argued by his counsel). The Court explained to the Defendant:

I do think that it may be necessary to bring some of that information

before the court if the defendant wants it.  Now, even though it's
harmful to him.  If he wants it, I do think he's entitled to have it
presented by way of allocution.  I appreciate Mr. Haddon's efforts to
get--maybe to prevent me from seeing some of that information or
listening to that testimony.  But if you want it, I will consider it and
act on it.  (Doc. 87, 16:16-25.)

All right.  Now, I'm going to give you one final word of advice.  I
think you're making a mistake by doing this, by insisting on it.  I
know whatever Mr. Haddon did, he did in a sincere belief that it was
in your best interests.  And the result of this may be a more severe
sentence that you will receive than you would otherwise receive had
you been sentenced earlier today.  But I'm going to continue the
sentencing hearing.  I will appoint other counsel to represent you.
And this will be the fourth--fourth counsel that you've had in this
case.  And I'll have to give him adequate time--or her, as the case
may be." (Doc. 87, 18:18-19:5.)

The Court is certain that the Defendant understood that Court was not in any way

threatening him with a punishment for asserting his rights.  Rather, from the clear

import of this on-the-record discussion, Defendant understood that the Court was

merely cautioning Defendant by underscoring what his own defense counsel had

just asserted--that presentation of the desired evidence could have an unexpected

negative consequence for the Defendant.

Reluctantly, this Court felt compelled to release Mr. Haddon as defense

counsel due to Defendant's insistence that his counsel should do these things for him that counsel deemed to be inadvisable. Therefore, the Court appointed new counsel, Mr. Holden.

The Court ordered that Mr. Holden be provided with a copy of the initial sentencing hearing transcript so that Mr. Holden would be apprised of the issues to be faced at sentencing. (Doc. 86.) Mr. Holden also had 45 days to prepare for sentencing. Nevertheless, and even though he was aware of the prior attorney-client conflict that led to the termination of the first sentencing, Mr. Holden, like Mr. Haddon, chose not present testimony of any of Defendant's doctors at the second sentencing, but chose instead to rely upon the recitation of medical and psychological information in the Presentence Report. This was obviously the cautious approach. This strategy allowed Defendant to assert his mitigating circumstances (combat service resulting in PTSD, which in turn led to the offense conduct) by means of the PSR without presenting witnesses for cross-examination or a psychosexual evaluation report that might contain both favorable and unfavorable information.

The Court's detailed notes from the final sentencing hearing in November indicates that the Court began the hearing by pointing out the previous attorney-client conflict regarding presentation of testimony and documentary evidence and emphasizing Defendant's right to present whatever allocution he wished.

In allocution, Mr. Holden asked the Court to consider Defendant's need for medical care and mental health treatment and to depart below the 135-168 month guideline range to a sentence of 120 months. Mr. Holden also asked the Court to recommend Defendant's placement at FMC Rochester, Minnesota. Mr. Holden emphasized Defendant's honorable discharge from the U.S. Marine Corps and the Florida National Guard.

The question now under consideration is whether Mr. Holden rendered ineffective assistance of counsel in that sentencing proceeding. During the sentencing hearing, the undersigned asked the Defendant whether he was satisfied with his counsel, and he replied, "Yes I am, Your Honor, thank you." Mr. Holden stated that after discussing the matter at length, the Defendant was now satisfied

that the Court had been adequately informed by paragraph 58 of the Presentence Report as to his PTSD diagnosis on November 11, 2009, by Earl T. Patterson, a now-retired VA psychologist. Mr. Holden stated that he and the Defendant had decided not to present any further evidence to the Court. Defendant's current claims of ineffective assistance in this regard are clearly without merit. Not one but two defense counsel assiduously avoided bringing in Defendant's psychological experts. It appears to this Court that these careful defense counsel protected Defendant from information that they judged not to be beneficial to Defendant's case. This was obviously a tactical decision by defense counsel, and the matter was aired thoroughly in open court at the time of sentencing. Significantly, Defendant agreed at the time of his second sentencing hearing that no testimony should be presented and that he was willing to stand on the information in the Presentence Report.

Defendant's claim of ineffective assistance by Mr. Holden at the time of sentencing is without merit.

Failure to File a Notice of Appeal

Defendant now claims that he left a message with Mr. Holden's secretary telling Mr. Holden that he wanted to file a direct appeal. (Doc. 100 at 43-44.) "[I]t is ineffective assistance of counsel to refuse to file a notice of appeal when your client tells you to, even if doing so would be contrary to the plea agreement and harmful to your client[.]" *United States v. Sandoval-Lopez*, 409 F.3d 1193, 1197 (9th Cir. 2005). The proper standard is *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

In *Roe v. Flores-Ortega*, 528 U.S. 470, 120 S.Ct. 1029, 145 L.Ed.2d 987 (2000), the Supreme Court determined that a reviewing court must determine, first, whether counsel consulted (*i.e.* advised as to advantages and disadvantages) with the defendant about an appeal, and, second, whether counsel failed to follow the defendant's express instructions regarding appeal. *Id.* at 478. If the defendant was unclear in expressing a preference for or against appeal, then the Defendant must show (1) that counsel's performance was deficient (*i.e.*, "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688), and

(2) Defendant was prejudiced thereby, *id.*, at 694. Failure to file a notice of appeal can be remedied via decision on a section 2255 motion by the Court simply by filing an amended judgment that triggers a new 14-day period for filing a notice of appeal.

By asserting a claim of ineffective assistance against Mr. Holden, Defendant has waived Mr. Holden's obligation of confidentiality to him regarding the matter in question. *Bittaker v. Woodford*, 331 F.3d 715, 716, 722 n.6 (9th Cir. 2003) (en banc). The Court will order Mr. Holden to file an affidavit stating his understanding of Defendant's instructions regarding a notice of appeal.

**Section 2255 Conclusion**

Thus, having considered the Defendant's Motion, the Court's file, and all the record of this case, the Court has determined that the Defendant is not entitled to relief as to Grounds 1 through 9. However, as to Ground 10, the Court requires a statement from Mr. Holden.

**Motion for Recusal**

Prior to filing his section 2255 motion, Defendant filed a Motion to Recuse the undersigned District Judge. The motion is clearly without merit, and the Court will describe the motion and the reasons for denial.

Section 455(a) of Title 28, United States Code, provides that "[a]ny justice, judge, or magistrate judge of the United States [should] disqualify himself in any proceeding in which his impartiality might reasonably be questioned." In addition, a judge should also recuse himself if he has a "personal bias or prejudice for or against a party." 28 U.S.C. § 455(b)(1). A motion for recusal is to be decided by the presiding judge. *See In re Barnard*, 31 F.3d 842, 843 (9th Cir. 1994) (motion for disqualification "is addressed to, and must be decided by, the very judge whose impartiality is being questioned."). However, "judges are not to recuse themselves lightly and should participate in cases assigned if there is no legitimate reason for disqualification." *United States v. Sierra Pacific Industries*, 759 F.Supp.2d 1198, 1205 (E.D. Cal. 2010) (quoting *United States v. Snyder*, 235

F.3d 42, 45 (1st Cir. 2000)).

A judge should disqualify himself if "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *Blixseth v. Yellowstone Mountain Club, LLC*, 742 F.3d 1215, 1219 (9th Cir. 2014) (quotation and citation omitted). For the purpose of this objective test, a reasonable person is a "well-informed" and "thoughtful observer," "someone who understand[s] all the relevant facts and has examined the record and the law." *United States v. Holland*, 519 F.3d 909, 913-14 (9th Cir. 2008) (internal citation omitted).

The "extrajudicial source" doctrine is also to be applied in a section 455(b)(1) analysis, meaning that the ground for disqualification must be "something other than rulings, opinions formed[,] or statements made by the judge during the course of trial." *Id.* Thus, the source of any "personal bias or prejudice" or "personal knowledge" of the judge must be derived from *outside* the judicial proceedings, not from within. *Liteky v. United States*, 510 U.S. 540, 554 (1994).

Defendant makes six allegations in support of the motion for recusal:

1. Defendant alleges that the undersigned had knowledge of the facts of the case obtained from outside the official record, to wit: I revealed that I knew that the complainant described in the search warrant affidavit had a minor child, which fact would have naturally assisted the complainant in recognizing child pornography if he saw it. Defendant poses the question "how did the court know complaint affiant had a daughter...." (Doc. 98-1 at 1.) I knew about the complainant's minor child because that fact was contained in the Jefferson County Sheriff's Office Incident Narrative, Exhibit B to Defendant's Motion to Suppress Evidence. (Doc. 28-1 at 4, (Exhibit B at 2).) Furthermore, it was perfectly appropriate for me to note that an inference could be made that the father of a 9-year-old girl might be capable of recognizing child pornography due to that particular life experience.

2. Defendant alleges that the undersigned stated during voir dire that the trial would be completed by Friday. Defendant asserts that he could not receive a fair trial with a time limit placed upon it. Although all time limits placed upon

trials are mere estimates, the Court always informs prospective jurors as to the estimated length of a trial as a courtesy to them and to allow prospective jurors to inform the Court of any problem they might have in serving for the entire trial. The Court has been so informing prospective jurors for decades. No reasonable person could deduce from this trial-time estimation that the trial judge was prejudiced against the Defendant or otherwise not impartial. After all, a reasonable person is not "hypersensitive or unduly suspicious...." *Blixseth*, 742 F.3d at 1219.

3. Defendant alleges that prior to voir dire, the undersigned "asked the prosecutor if she had filed absconding charges against the defendant yet?" (Doc. 98-1 at 2.) Defendant believes that the "court itself was instructing prosecution to file additional charges against defendant thereby showing the court was biased and unfair against defendant." (Doc. 98-1 at 2.)

Defendant is mistaken. He is referring to the Court's pre-trial conference with counsel (outside the presence of the jury) that was held for the purpose of discussing evidentiary matters raised by counsel in their trial briefs and particular

jury instructions placed in issue by that evidence. It was not the Court, but the prosecutor who raised the matter of Defendant's flight from prosecution. The prosecutor wished to present evidence during trial of the Defendant's removal of his ankle bracelet, his flight, and his use of a false identity. Defense counsel objected to that evidence and objected to any jury instruction regarding Defendant's flight, suggesting that the prosecutor could have instead filed a superseding indictment to prosecute the Defendant. I asked defense counsel whether he would rather have the government indict than have evidence of the flight introduced into the underlying case. Defense counsel responded that he would rather face that evidence "head on", *i.e.,* would rather require the government to present its evidence to a grand jury to obtain an indictment. The Court ruled on the evidence, heard counsel on other pretrial matters and then began the trial. No reasonable person informed of the facts and the law in the case would conclude that the undersigned's discussion of proposed evidence and jury instructions betrayed favoritism or antagonism toward either party.

 4. Defendant alleges that he wanted to accept the government's original

written plea offer (dismiss Counts I and III and plead to Count II). Defendant claims that the undersigned required the prosecutor to offer him a dismissal of Count I only if he pleaded guilty to Counts II and III. Defendant alleges that the undersigned met on an *ex parte* basis with the prosecutor and told the prosecutor that the undersigned was "pissed off at the defendant." (Doc. 98-1 at 4.) However, this bald accusation simply does not fit with my notes or the record. I was informed by the deputy clerk of court that Defendant was negotiating a plea agreement with his counsel and the prosecutor. I did not meet with the prosecutor and tell her what plea agreement she could or could not make. In open court, I told the Defendant and both counsel that I do not normally accept a plea bargain after trial has begun, but only accept a plea to the entire charge. (Doc. 95, SENT TR 5:3-7.) I did accept the plea bargain proposed by the parties in this case, however, because I thought it was beneficial to the Defendant and a good resolution of the case. All counsel and the Defendant stated on the record that the Court had not participated in his plea bargaining, and Defendant so stated under oath. (Doc. 95 at 14:10-25, 15:1-11.)

Essentially, what happened here is that Defendant discovered that the written plea agreement offered to him by the government one year earlier was no longer available. Given Defendant's intervening flight from prosecution, this should not have been surprising to him. Hurried bargaining took place while a jury waited for opening statements. Although the government won the additional concession that Defendant would plead guilty to Count III, Defendant likewise obtained the additional benefit that he would not be prosecuted for absconding. This was the agreement that the parties brought to the Court, and the Court accepted it. Defendant's accusations of judicial manipulation are palpably incredible and unsupported by the record. No reasonable person examining the record would conclude that there was an appearance of impropriety in the proceeding or that the Court's conduct was not impartial.

5. Defendant alleges that during his first sentencing hearing, he had only been granted 20 minutes to review with his counsel the final revisions to his Presentence Report. Defendant asserts that this "lack of concern" by the court deprived him of a "fair and impartial hearing." (Doc. 98-1 at 4.) The sentencing

transcript indicates that Defendant claimed that his counsel had not reviewed the Presentence Report with him.  (Doc. 87, SENT TR  5:22-5.)  Defense counsel, however, pointed out that he had reviewed the draft Presentence Report with the Defendant in person at the regional prison in Shelby, Montana, and only a minor revision had been made after that point.  (Doc. 87, SENT TR 6:17-7:7.) Therefore, the Court *sua sponte* decided to recess the sentencing hearing to permit the Defendant to review the final Presentence Report with his counsel.  No reasonable person examining the record would conclude that there was an appearance of impropriety in the proceeding or that the Court's conduct was not impartial.

6.    Defendant alleges that this Court should have declared a mistrial during Defendant's sentencing hearing due to defense counsel's ineffective assistance. Although I did not declare a mistrial at a sentencing, I did grant Defendant's request for new counsel at the conclusion of the sentencing hearing.  No reasonable person examining the record would conclude that there was an appearance of impropriety in the proceeding or that the Court's conduct was not

impartial.

The Court concludes that Defendant's Motion to Recuse is without merit.

Accordingly,

IT IS HEREBY ORDERED that Defendant's Motion to Recuse (Doc. 98) is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion Pursuant to 28 U.S.C. § 2255 (Doc. 99) is DENIED as to Grounds 1-9 only.

IT IS FURTHER ORDERED that Mr. Jason Holden shall file an affidavit within 20 days of this Order informing the Court of the reason he did not file a notice of appeal in this case.

The Clerk is directed forthwith to notify Defendant Glenn Steven Scott and Mr. Holden of the entry of this order.

Done and Dated this 28th day of August, 2014.

CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE